United States v. Barai and Khartan. The appellants have two different counsel, one for 10 minutes and both for 10 minutes. How are you going to break up your time? If are you going to save any time for rebuttal? Yes, Your Honor, this is John Markham. Good morning to the panel for Satish Barai. And we've agreed to split 10 minutes, 10 minutes, he will address certain matters in depth, I will address other matters in depth that I'd like to reserve two minutes of my time for rebuttal, if the court will allow. Very well, but we'll keep an eye on the clock. And then we'll try to help you. I'm sorry, this is William Fick for Mr. Khartan. I would also like to reserve two minutes for rebuttal. Very well. Okay. Which of you is going first? I believe that I am, Your Honor. Very well, please proceed. John Markham. May it please the court and the panel. This is a case of a victim of a slavery prohibition. And in order to convict someone, there has to be proof beyond a reasonable doubt that the jury must find that the employer intended to cause the victim, to make clear to the victim that she would suffer serious harm, thus forcing her by threat of serious harm to stay. Now, our first point in our brief is that there was intention by the use of force. And I want to walk through very briefly what each of these individuals said, because they deny that they were kept. One stayed for four days, one stayed for a month and two days, one stayed for 11 days. One indeed, when she left, she testified that my client's co-defendant, her husband, helped her change her airline reservation so she could leave early. That is hardly... Counsel, you of course can manage your case however you wish. But it's unusual for a successful case to rely upon trying to overcome the evidence that was presented. Is that your best case? Is that what you're going to go on, is trying to show that there's insufficient evidence? Your Honor, I realize it's a very high bar. And I don't lightly spend as much time as I'm spending on it. I covered the other matters in my brief and my co-counsel, Brother Fick, is going to address those. I got it. You can manage it however you want. I'm just surprised that you're starting with the sufficiency of the evidence. Well, I have a question as well. Doesn't the Martinez-Rodriguez case foreclose the argument that the duration of the labor or even voluntarily leaving of your own volition preclude a violation of the forced labor statute? I don't think so. When that is accompanied by the alleged victim's testimony, and they were victims, they were treated very badly. Nobody likes what happened to them. And I'm certainly not going to defend my client's behavior. A rational juror could find that my client was hateful. But the question is, if they say no, there was no restriction on my leaving. And if one of them says, I said I was going to leave, and the there were no locks on the door, and if they left, they locked the door from inside and left the key. But what about the other evidence that when at least one said that they were going to leave, they said, I'm going to turn you into the police. And then Ms. Barai said, well, turn her passport over to the police. And similarly, when another nanny said they were going to leave, the defendant said that we'd call the police on you or refuse, you know, Mr. Carton refused to give the home address for one nanny's son to come to the home and then ultimately gave the wrong address. Well, I respectfully submit that that really should be overridden here. I don't think a rational jury can convict somebody for trying to make somebody stay under threat of force, threat of serious bodily injury, Your Honor, by calling to rearrange their flight schedule so they can lose, leave early or by saying get out. I agree with you, you can in effect enslave somebody for a day, and you qualify under the federal statute. But you have to show a threat of force that induce it that makes the victim believe that they must stay, or they'll be subjected to serious bodily harm. So if you say to somebody I'm going to call the police in the abstract, they didn't there's no testimony that well, I'm going to call the police if you leave. What they said was, I want to leave my bag is packed. Okay, get out. I believe that in the absence of any physical restraints on them. And what about when your client, when one of the nannies Thomas said that she just couldn't work that those hours anymore, your your your client said, I'm going to kill you. And I'm gonna put you in the garbage. That's not a threat of force. Yes, it's a threat of force. And they did use some force that the hand on the on the stove, and the alleged pushing somebody down the stairs, although that was hearsay, your client hit that same, same nanny in the mouth when she's no, I close for drying. I had a list and that was on my list. There's no question. But none of that was in order to induce them to stay. That is a fact that is a state assault case. And had this been brought to the district attorney in Sacramento or wherever the venue is for this, whichever county would have been in, they rich richly would have deserved to be prosecuted to the full extent of the law. But the question is, did anything that was said to them, threats of violence or threats of serious substantial bodily harm or bodily harm? Was it done with the intent to make them stay and work? And if you have them saying get out, get out. Indeed, these the defense, I'm sorry, the prosecution said that this was a revolving foreign employment, or foreign labor system. It was because they let them go. And another another one of the defendants said, Is it your testimony that you told them you wanted to go? Yes. And what did they say? You go right now from the house. Another one said they did not lock the door. So I opened the door and I left. Another one said I put my bags and my clothes in my bag after three, four or five days. And I said I wanted to leave. I wanted to leave. And they said, Go ahead. Did you have any restrictions? Another one in this is all on pages six to 11. No, I didn't feel any restriction like that. Now, again, the demarcation line between nasty behavior, assaulted behavior, criminally assaulted behavior, which is prohibited by the state. And this, taking this violence and doing something with it that offends the federal statute having its origin in 13th Amendment. It's it's not it's easy to define. And it's Ninth Circuit, your prior decisions, your honor, made clear that there has to be a threat of substantial force in order to make them stay. So what about what Judge Coe asked you? I mean, when somebody threatens to kill somebody, isn't that a threat of substantial force? It absolutely is. Then what's the problem? It absolutely is. But there is. She didn't say if this was I believe this was Gooney. And Gooney left after four days, nobody stopped Gooney from leaving. And nobody said, I'm going to kill you if you leave. These were despicable actions that they did, your honor. But the demarcation line for making a federal offense is to force people to stay by that conduct. Otherwise, you take it to the district attorney, and the district attorney promises it as assault. That's my major point. I point out only that. I think what happened below was that everybody got so carried away with the horrible conduct that they didn't read the federal state line the way they should have. And the way I ask you respectfully, to view it, you want to say to my colleague, because he's going to start throwing things at me now. If I use up any of this, just save the balance of your time for the rebuttal that you require. Very well. Okay, let's hear from your colleague. Oh, good morning. May it please the court William Fick for sir, your video is off. I mean, if you'd like to keep it up, that's fine. But earlier, so Mr. curtains trial was riddled with legal errors that warrant reversal and it resulted in an unconscionable 188 month sentence of imprisonment. Unless the court wishes to direct me elsewhere, I'm going to begin with the sentencing issues. Neither the district court nor the government have provided any justification for a sentence that is more than double the national and triple the circuit averages in forced labor cases. Nor did the district court or the government engage with any of the numerous published cases involving much lower sentences for far more egregious conduct, involving, for example, years of actual bondage, torture, sexual abuse, and hundreds of 1000s of dollars in wage theft, all of which all of these cases which 72 months or less. The 188 months sentence in this case is truly a radical outlier. And just as one example, I would point to, for example, the column limbs case from the seventh circuit, which this court relied upon heavily in Dan. In that case, there was $900,000 in restitution for keeping a nanny in bondage for 19 years hidden in the basement without access to a phone, medical care or any family contact. And the sentence was 72 months. Now, that procedurally, or substantively unreasonable result is not surprising in this case, given the procedural deficiencies of the sentencing proceedings. And the district court, and this is all laid out fairly methodically in our briefs, the district court failed to make required findings of fact to support the guideline enhancements that were employed, failed to address the counsel appointed to and abused his discretion and refusing to even consider the well reasoned and documented PSR objections that Mr. cartons new sentencing counsel made nearly six months prior to the sentencing hearing. Now, this court has held repeatedly that a district court cannot simply adopt the PSR and prosecution findings or filings. reasoned findings by the court itself are required. For example, as this court said in an explanation must be sufficiently detailed to permit meaningful appellate review. And it must state the court's reasons for rejecting all non frivolous arguments. This deficiency is particularly troubling here because this court also requires proof of enhancements by clear and convincing evidence where as here multiple enhancements apply the dramatically increase the sentence that's this court's in Jordan. Here, there was a 13 level increase based on the enhancements which raised the guideline sentencing range, the advisory range, the base of the range from 41 months to 168 months. So not only did the district court fail to make any findings about any of the enhancements or their factual basis at all, it certainly didn't come close to making those findings by a clear and convincing evidence standard. Let me ask you a question, aren't the cases that reject the adoptive approach distinguishable on their facts, for example, and that the district court actually referred to the wrong 3553 a factor. So in all of those cases, the adoption is insufficient because there's really no basis for the appellate court to review exactly what the district court did. For example, there's an adoption of a PSR that doesn't show how the district court calculated the loss amount. And in this case, identify an issue for which we can't really evaluate what the district court did. Well, in the first instance, the district court should make its evaluation first so that the court is acting is sort of not making its own sort of sui generis determination from the record from the cold record, but is actually engaging a decision that the district court made in a reasonable way. And that's absent here. Just as one example, though, take, for example, the serious bodily injury enhancement. The guideline expressly requires injury involving extreme physical pain or protracted impairment of a function of a bodily member organ or mental faculty requiring medical interventions such as surgery, hospitalization or physical rehabilitation. Here, whatever one thinks of the conflicting testimony about the burned hand, the treatment at the hospital the testimony was that it was cleaned, wrapped, and the woman was sent home. There's a legion of cases that we cited in our briefs where, you know, much, much more serious injuries are not found to qualify as serious bodily injury, you know, on that sort of continuum. And so here with the district court did not address those issues, did not make findings about what it thought the injury actually was. There's nothing for this court to review. And if the court is going to review it based just simply on the cold record sort of de novo or on its own, I would submit that the evidence in the record does not come close to supporting the serious bodily injury enhancement, certainly not by clear and convincing evidence, given the very specific and extreme injury that is required under the guideline definition. Counselor, listen to me, counsel. My understanding of the evidence is that those burns were second degree burns with blisters. Do you believe that's not true? The evidence actually on this was very, was very weak, I would suggest. Maybe so, but wasn't there evidence that one or more doctors indicated that that's what they saw? That's what they treated? This is quoted extensively, I think, in our reply and opening brief, but the emergency room doctor sort of found simply based on the self report questionable second first or second degree burns. But the nature of the injury was really just in the nature of sort of white, whiteness or kind of callusing on the hands. The treatment that was given including included a cream that will be contraindicated for burns. And simply the evidence. Other than the self report, the evidence pointed against they're actually being second degree burns. And given the guideline definition, even if there were second degree burns, certainly the nature of the burns that were described in this case, if in fact they were burns would not rise to the level of serious bodily injury under the guideline. And at a minimum, again, the district court did not parse through that evidence. And there was a lot of conflicting evidence on the record. And where it has to be clear and convincing, I would submit it failed to reach that mark. Can I ask you a question about the standard of review on this serious bodily injury? The district court's application of facts is reviewed for abuse of discretion. The district court's factual findings is reviewed for clear error. And I agree with you in this case, the government would have to establish the facts for sentencing enhancement by clear and convincing evidence. So you just mentioned de novo. But But tell me the decision about whether the burns were a serious bodily injury. Is that a factual finding reviewed for clear error? Or is that an application of the guidelines to facts that's reviewed for abuse of discretion? Or is it a combination? So it would be reviewed ordinarily for abuse of discretion, if if the district court had made a reason finding on that basis, but whereas here, the district court simply adopted the government's briefing and the PSR, the standard of review is higher, it's essentially de novo. And we laid this out in our in our opening brief, there was okay, but that but that judge saw an 11 day jury trial. So I know you're saying that they just, you know, rubber stamp something, but that judge saw 11 day jury trial saw all of the evidence exhibits witness testimony that the jury did. So based on that, which is more than most district judges would see at sentencing, right, they wouldn't really see the underlying evidence unless it went to trial. So explain in that situation. Well, okay, so your your position is, it's not abuse of discretion. Correct. What it's a it's a lesser standard than abuse of discretion here, because the district court did not make any findings to sit through and evaluate and explain how he was applying and weighing the conflicting trial evidence. He indeed saw a lot of evidence, but he made no attempt to explain it sentencing, how he was evaluating that evidence, what he was crediting and not crediting and why. Therefore, this court has no basis to make a reason to pellet review. And so for that reason, it's, it's essentially de novo review. Council, do you want to save any of your time? You're down to a minute? I would your honor. Yes, I'd save the minute. Thank you very well. All right, let's let's hear from the government. And then we'll give our the appellant counsel a chance to rebut. We have a live person in the courtroom. All right. Good morning. Good morning. And may it please the court. Catherine Lydon on behalf of the United States. Both defendants received fair trials and fair sentences. The defendants attacks on their convictions, mainly stemming from the district courts. Reasonable treatment of Cartan's own refusal to continue undergoing cross examination and his motion to strike his testimony is legal and a smattering of evidentiary issues are legally baseless. Can you speak up just a little bit of your partner? I think probably for online to hear. Yes. Thank you, Your Honor. And their various attacks on their sentences misread the law around forced labor and rest on a version of the facts that the jury and the district court widely rejected. And we can we start with the point made by opposing counsel regarding the hand injuries? As you know, the sentencing guidelines definition for serious bodily injury, uh, involving in, quote, surgery, hospitalization or physical rehabilitation. Uh, given what actually happened when, um, uh, Ms Tomas, I guess is the way you say her name was taken to the hospital. Does that meet the requirements of that portion of the sentencing guidelines? It does, Your Honor. Please tell me why the specific portion of the definition in, um, of serious bodily injury is in one B 1.1 application note. Um, and a serious bodily injury is one that, quote, involved extreme pain. And that fact is established by Thomas own testimony that it hurt by the testimony corroborating her the night she was rescued of the Nunez sisters, the neighbors who she she ran to their house after she was rescued. And she asked question. So the commentary in the guidelines says a bodily injury is an injury that is painful. That involved extreme pain, Your Honor. That Yeah, that's the definition of serious bodily injury. But why wouldn't, uh, her her pain just fall into the bodily injury definition? Why is it extreme physical pain? Because as Judge Smith points out, none of the other aspects of the serious bodily injury definition seemed to apply here. There was no projected impairment of her hand. She certainly didn't require surgery, hospitalization or physical rehabilitation. Your Honor. First, one aspect of the definition is sufficient. So guidelines don't apply here. Some do, specifically that it involved extreme pain. It also, quote, required medical intervention. Another criteria set forth in the definition. So forgive me, counsel, just to clarify, you're saying that the commentary in effect is of equal dignity to the language of the guidelines themselves. So medical intervention and extreme pain are as important as surgery, hospitalization or physical rehabilitation. Is that correct? Yes, Your Honor. Do you have any cases or any authority that would substantiate that point? I think, uh, just the generalized case law about nothing in particular, Your Honor, that the guidelines are authoritative or the commentary when it interprets a guideline, when it defines a guideline. That's what I'm focusing on, is that you're referring to two elements of the commentary, i.e. the extreme pain and medical intervention and treating the commentary as if it were part of the guidelines. And that's what I'm, I take your point that that brings it, what happened here within the commentary. But is the commentary of equal dignity to the actual language of the guideline? Yes, Your Honor, because it is attempting to define the language of the guideline in the government's view. And you're saying there's no, you don't know of any specific case or cases that say that. You're just saying that as a matter of general principle, that, that helps to, to, if you will, inform the meaning of surgery, hospitalization or physical rehabilitation. Is that right? Correct, Your Honor. And here, hospitalization was required. An officer, officer should... But, but, but that's, I don't know if that's the definition of hospitalization. I was going to ask you, just seeing a doctor, why does that rise to the level of surgery? Hospitalization is understood to be inpatient, not outpatient, in my view, or physical rehabilitation. None of those reached, you know, her just going in and seeing a doctor because law enforcement thought that she needed to, doesn't seem to rise to that level of medical intervention. I don't think that the hospitalization necessarily requires surgery or inpatient, Your Honor. It simply does say hospitalization. And here when the officer showed up and they looked at the condition of her hands, they determined this woman needs hospitalization. She arrived at the hospital and Dr. Alfaro diagnosed her with first and second degree burns on both hands and dressed and treated those injuries. So we would submit that the hospitalization criteria is met. And given that... But what's your, what's your view of the standard of review on this question of the serious bodily injury enhancement? What, what part of it is factual, subject to clear error review? What part of it is application of the guidelines, subject to abuse of discretion? Abuse of discretion, and that the district court, who, as Your Honor pointed out, just sat through an 11-day trial and absorbed all the testimony regarding this burn from Defendant Brey, from Thoma, the victim, from the emergency room doctor, from the officer, and from the two sisters who helped her that night. But, but isn't it a factual, isn't it a factual decision of whether the pain rose to the level of extreme physical pain? That seems like a factual decision and not an application of the guidelines to me. It's, it's a tricky, Your Honor. But it seems to me like it is an application of the facts to the guidelines, because we've just been grappling with this definition of serious bodily injury. And that seems like, like the key question. Opposing counsel makes much of the fact that, at least in their view, the district court did not, if you will, explain all of its reasons for imposing sentence, aspects of sentence. And for example, this one in particular about the hand, does it matter from your perspective whether the government said anything about that, or is it like 3553A factors, where there's a, almost a presumption that since the court, in this case, referred to PSR and so on, that he or she considered them, but didn't have to say so specifically. Is that what we're dealing with here? Yes, Your Honor. And here we don't even need the presumption. The district court's resolution of the disputed issues in the PSR meets the standard in rule 32 and set forth in this court's Carterman decision. The district court here stated, just as the Carterman court did, that it had reviewed all the materials submitted, and in its view, the government was correct as to the disputed issues. In Carterman, it was the amount of unreported income. Here it is various sentencing enhancements. And it is- So the court reviewed them. Does the court have to in any way say, and as a result of reviewing them, I have come to the following conclusions for the following reasons, or can it simply adopt, if you will, in haec verba, without saying so, the reasoning of the PSR and the other materials? The latter, Your Honor. And what case law would back that up? Carterman. That the court must simply quote, or need only state the court's resolution of the disputed issue. And that is what occurred here. So counsel, what's your best evidence that she wasn't in the record, that she was in extreme pain? Her own testimony, Your Honor, about- Okay, I'm looking at her testimony on 608. And a question, did it hurt? Yes, it was. It was painful. Is there anything else? She testified that Ms. Buray smacked her hand down into the open flames of a glass stove, or a gas stove. So there's a certain amount of common sense that we can bring to bear about the pain that that would cause, as well as the injuries that resulted. Her testimony was that it was painful. Yes. Thank you. But we also have the medical view. So the reference that my colleague referred to was her overall experience, but it didn't deal with when she actually had their hand put in the fire, which would have been another aspect, another, if you will, time tranche where she suffered pain. Is that right? No, Judge Thomas was reading from the transcript, which she described. About that point. Okay. Yes. Yes, Your Honor. But- Not when she was in the hospital. She never said she was in extreme pain, correct? That's true, Your Honor. But that's one of the things that doesn't jump off a bare transcript page. When she said, I was in extreme pain, or I was in pain, the district had the ability to evaluate that testimony. And the testimony could have been developed, but her own testimony is that it was painful. Correct, Your Honor. That's it. Yes. I'd like to go to a different topic. Why should withdrawn testimony be held against Mr. Carton at sentencing? He abandoned it. He disowned it. Doesn't withdrawal have, or should it have any impact on an obstruction enhancement? He didn't sort of double down. He said, I'm letting it go. I'm abandoning this. And it still got held against him at sentencing. Yes, properly. So because Mr. Carton did perjure himself and did attempt to obstruct justice, but he walked away from it, right, by saying, you know, the jury shouldn't consider it. Please strike it. He did because it was about to get worse for him, and it was going very, very badly. There is no, none of this court's decisions pertaining to the obstruction enhancement say that if the defendant decides that the jury is not buying it and it's just going to get worse from there, that he should be able to call a mulligan and no longer be subject to an enhancement in offense level for his previous attempt at obstruction of justice. The district court made all the findings required explicitly on the record by the Castro-Pons case. And they apply regardless of whether the defendant moved to strike his testimony. I'd like to move to two other points if there's time, of this panel might have about any other aspects of the case. But before you move on, in response to Judge Coe's question, do you know of any case or cases that say that when testimony has been withdrawn, that it's okay for the district judge or not district judge, excuse me, counsel or the government to make references, maybe just obliquely, in comments to the jury? No, Your Honor. But I would submit that that's not, well, actually, yes. So two points. First, the, factually, I did not do that. Oh, you were the trial counsel. I was, Your Honor. There you go. And I was careful with my pronouns during closing. So. You have to be careful with pronouns these days. Well, the defendants were two different genders. So when I was referring to the way that the defendants reacted to the victims questioning them, to smack them across the mouth and yell at them and clap their hands, work, work, work, work, work, I used they to refer to both of them, but when I referred to defendant Burai's demeanor on the stand, I used her. So the actual quote that defendants complain of on appeal is at ER 2091, quote, and you can evaluate her demeanor when answering questions. These defendants don't like answering questions. You know that from what the victims told you about how they responded when questioned. Right. So they're in addition to they were just they could infer that because his testimony was withdrawn, that there was a reference there. But you didn't expressly call this out. Is that right? Correct. I didn't call out his withdrawn testimony. I didn't want to draw any further attention to his withdrawn testimony, but I didn't comment on his withdrawn testimony. Thank you. I'd like to briefly hit the means elements question. And then also one of the evidentiary issues, if there's time. So there are at least four reasons why the statutory subsections of the forced labor statute are means, not elements. So first is the statutory text where the Supreme Court said we should start for the means elements distinction in Richardson. The statute itself lists the prohibited means using the word means four times and then a fifth time and says in any combination of means. None of you a different question. And I apologize to my colleagues. If you do want the government lawyer to address the means, I'm happy to do that. But I had a question about the evidentiary and I just want to make sure we don't run out of time. Yes. If that's OK. Another issue. Is the. Alleged excited utterance of Lakshmi Vitturi, you can see that really wasn't an excited utterance, or at least there's not enough in the record to say that that was an excited utterance. Do you agree with that? Because you seem to argue a harmless error. I argue both, Your Honor. And I appreciate the opportunity to address this one. So no, we don't think it was an abuse of discretion to admit the statements. So we look at the foundation before the district court. This woman was agitated, talking fast, crying at times at ER 1135. And it was during a short visit when she was able to escape Mr. Burai's house to the Saifuddin's. Afshan Saifuddin, the neighbor, described those visits as three or four minutes. And when she told Ms. Saifuddin about the stairs incident, she was crying. The statement was made to a neighbor, not to law enforcement. There's there's no intention or no incentive for her to fabricate. I'd like to address the time period of Lakshmi's statement to the Saifuddin's because that might not be entirely clear from the briefs. The defendants focus on a statement in the government's motions in limine to argue that Lakshmi made the stairs statement while she was at the neighbor's house for a three-day period. The motions in limine were written prior to trial based on the prosecution's understanding of the facts through agent reports. And there are aspects of that motion in limine that are incorrect. For example, they state that the statements were made to Mr. Saifuddin. In reality, they were made to Ms. Saifuddin. And the trial record is much clearer. There are three distinct periods of Lakshmi interacting with the neighbors. First, a period where she was living at Cartan and Bry's house. She would sneak over for quick three or four minute bursts and run back. What's the time period between when this pushing down the stairs by Mr. Cartan happened and when she reported it to the neighbors? That is not that connection. That is not entirely clear, Your Honor. But and when we need that to or when the district court need that to say that that is an excited utterance? No, Your Honor. The district court considered that the startling event or condition was her period of confinement and forced servitude at the Cartan and Bry residence. So when she escaped from that period and ran over three or four minutes, she was still under the startling event or conditions. So I'm looking at Excerpt of Record 281 through 282. This is in ruling on the motion in limine. The district court took this broader interpretation. He reasoned, quote, when you look at the totality of the circumstances and how the victims were kept in a, for lack of a better term, enclosed compound, when the person is able to get out of that compound and makes that statement at the time, I consider that to be something that would be, in essence, an excited utterance. So although the time between the stairs incident happening and when she told Mr. Seif, Ms. Seifudin is not known, there were only a few minutes between her slipping out and telling the first person. So you're saying the district judge basically viewed the, you will, terror, angst, excitement that she had and the circumstances she had as she ran over there, he still treated it as an excited utterance, although it doesn't fit the typical excited utterance circumstance. Is that a fair statement? Yes, Your Honor. I think it is unusual that you would have a period of a sort of ongoing physical excited state. Even if the judge was wrong, it was harmless. It was not an abuse of discretion for him to conclude that and it was harmless. So to the not abuse of discretion point, this court's decision in Rivera, I think, supports the district court's interpretation there. There was the time period was known. It was a half an hour between the rape and when the girl got back to her mother and was able to report it. But the court reasoned that a victim who tells someone once she gets to a place of safety can make an excited utterance. That's what happened here. So it was not an abuse of discretion and any error would be harmless. It wouldn't have changed the verdict, certainly not as to the conspiracy count, which is the only count that Lakshmi could have impacted because she was an uncharged victim. Can I ask you one last question? So let's say we find that admitting Lakshmi Vachuri's statement was error. Let's say we find it was error not to give an adverse inference instruction. Let's say we find that the instruction, quote, you are to consider the fact, in essence, that Mr. Carton did not testify in this trial, end quote, was actually an instruction to make an adverse inference. And that was an error. And let's say we find there was an error to exclude as hearsay, Carton's testimony about his phone statements to Tama before she came to work for the family. Although I understand later the substance of it was allowed in his direct. What point does this not become cumulative error that makes the trial fundamentally unfair? I wish I had an opportunity to add some other defense raises, but let's just let's just go with those. OK, if I may briefly address some of those those particulars, because they were none of them constituted error, particularly that last one. So first, our argument is they were not cumulative error because there was no error and because the evidence was absolutely overwhelming. Any cumulative error argument needs to be evaluated on the basis of the trial as a whole. Here, the government presented the testimony of three victims who didn't know each other, who presented the same story about what the defendants did to them, because the defendants had a playbook. They did it to everyone. We had testimony from outside the vantage points that two separate sets of neighbors, a law enforcement officer, a pattern and practice that repeated. I'm up here. I'm about to be out of time. May I respond to one point? Yeah, you can respond to the question. Thank you. With respect to the ability to testify about his interaction with Thama, there was no restriction on Cartan's ability to testify about his conversation with Thama. While initial hearsay objections were sustained, then after a break at which the  I want to return to the conversation with Thama and ask the exact same line of questioning. He asked him to say, he asked Mr. Cartan to tell him what you said to Thama. So there was no restriction. There could be no violation of Mr. Cartan's rights to present a defense on the basis of that. And now my time has expired. Do either of my colleagues have additional questions for counsel? No. All right. Thank you. Thank you very much. So that you affirm. Okay. All right. I guess we'll proceed in the same order we did before. Please proceed with your, I guess it's Mr. Markham first, right? You're muted. There you go. You're muted. I apologize. That's okay. First of all, on the point of the excited utterance exception to the hearsay rule, there is no case where that has ever preceded by somebody walking next door to a woman and asking for tea. That is just not the stuff of the proper foundation under evidence code 104 to then say, oh, and he pushed me down the stairs. That is very highly prejudicial evidence that he pushed her down the stairs, which really brings me to what I think is, well, is my main argument. And that is, there is no association between the violent conduct, however there is a case that I hold in 2011 ninth circuit case where it says the scope of the statute is narrowed by the requirement of Center. The jury must find that the employer intended to cause the victim to believe she would suffer serious harm. I respectfully submit. What about the fact that the substantive counts all dealt with Tama and Thapa and had nothing to do with Vittori? So the excited utterance only is relevant to the conspiracy count. And we could find there was overwhelming evidence on the conspiracy count. Well, your honor, I was just going to address the conspiracy count and let me answer it this way. We at the trial, the trial lawyers asked that the jury be instructed to find unanimously a specific overt act. And we've argued that in our papers, the point about that is highlighted by the fact that the evidence is very murky of any intent to make them stay and work as opposed to your complete jerks. And you did hateful things and throwing somebody down the stairs. That's terrible. And they could, that could still over, even if it didn't apply to one of the people who were charged in the indictment. But our point is if the jury had been told, find one of the overt facts, which are listed at page 23 and 24 of our opening brief, find one of those beyond a reasonable doubt, then we could have had a much better ability to argue that overt act had nothing to do with intending them to stay. One of the overt acts is that they talk about plans to go home. That clearly can't qualify. Okay. We'll ask your honor to think carefully about what Dan said was the scope of the statute being narrowed in the way that I have argued and that without any specification of the overt act, we have no idea what they thought. We don't know whether they thought, well, they pushed him down the stairs. That's terrible. It can't be you're, you're over your time, but let me ask my colleagues. Does either have additional questions for Mr. Markham? Oh, thank you. No. Okay. Thank you. Thank you for your time. So Mr. Fick, you have some rebuttal time. Thank you, your honor. Um, so this court in Windsor versus Hall made very clear that the mere fact someone is upset or excited does not create an excited utterance. We do not know here when the alleged stair incident happened relative to the statement. We do know that when Lakshmi came over to the neighbor's house, the cartels were away for some extended period of time. Now, so what should we do since we don't have much time on this? What, what's your response to judge Coe's point that the excited utterance only dealt with the conspiracy count in this matter? So if you look at page 20 of our reply, we talk pretty extensively about the way the government used this evidence in its closing, they use this evidence to talk about, or to, to, to bolster. What they claimed was Mr. Cartan's modus operandi. And this was the only evidence in the case of any actual act of violence by Mr. Cartan. And so the government used it to bolster both the conspiracy counts and the substantive counts against the individuals. It was essentially being used as like character or propensity evidence, at least in terms of the way the government argued it in its closing. And so we would suggest that the admission of this highly prejudicial evidence tainted the conviction on all counts. And for that reason requires even standing alone, quite apart from all of the other errors requires reversal. Can I ask you a different question? In United States versus King, this court has held that a district court is permitted to instruct a jury to consider a defendant's refusal to answer questions on cross and actually in that case lays out a whole bunch of things that a trial court can, can impose if a defendant refuses to answer questions on cross. So understanding that's the case, why isn't Mr. Cartan's withdrawal effectively the equivalent of a refusal to answer questions on cross examination such that the district court could have instructed the jury to consider the fact that Mr. Cartan was refusing to answer questions on cross. So the way the parties in the court structure, this so-called agreement to withdraw testimony here was specifically designed to avoid the kinds of issues that this court raised in King. And I think probably earlier in the Hearst case, right. And there was, there's even an extensive colloquy that we, that we quote in the briefs where the government, the court and defense council talk about how this is not like Hearst. This is not a case where the defendant refused to answer questions. We are structuring this agreement in such a way that it's simply going to be withdrawn. No one could, no one can comment about it. That was the nature of the agreement among all the parties and the court. Now we can sit here and as we argued in the brief, this agreement never should have happened. The court should have taken, taken upon itself to at least inquire whether Mr. Cartan understood what he was doing, particularly after he was, you know, could barely get a word in edgewise during the colloquy and was trying to say, look, I really want to tell the truth here, but I'm not being allowed to do so. But ultimately the decision that's reached is sort of all predicated on the notion that one, no one can talk about it. And two, there is no adverse consequence. And that's, that's sort of part and parcel of what was agreed upon. And so for that to be upended, both by arguments in closing by instructions and by imposing an instruction enhancement of sentencing, all three of those things are uniquely unfair to Mr. Cartan in the circumstances. Okay. Uh, any other questions by my colleagues of, uh, Mr. Bishop? No, thank you. All right. Thanks to all counsel in the case just argued. The case just argued is submitted and the court stands adjourned for the day. All rise. The court for this session stands adjourned.
judges: THOMAS, SMITH, KOH